# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAYVON WRIGHT, ANTOINE MURREY, KEITH MEDLEY, GREGORY GRIFFIN, AND RASHAD EL, INDIVIDUALLY, And on behalf of a Class of others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> City of Wilmington <br><br> Defendant | CASE NO. 13-1966-SLR/SRF <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

### JURISDICTION

1. This Court has jurisdiction over this action under the provisions of 28 U.S.C. §§1331, 1341 & 1343 because it is filed to obtain compensatory damages and injunctive relief for the deprivation, under color of state law, of the rights of citizens of the United States secured by the Constitution and federal law pursuant to 42 U.S.C. § 1983.

2. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class claims occurred within this judicial district.

### PARTIES

3. Plaintiff Jayvon Wright ("Wright") is and at all relevant times mentioned herein was, a citizen of the United States and residing in Wilmington, Delaware.

4. Plaintiff Antoine Murrey ("Murrey") is and at all relevant times mentioned herein was, a citizen of the United States and residing in Dover, Delaware.

5. Plaintiff Keith Medley ("Medley") is and at all relevant times mentioned herein was, a

1

citizen of the United States and residing in Wilmington, Delaware.

6. Plaintiff Gregory Griffin ("Griffin") is and at all relevant times mentioned herein was, a citizen of the United States and residing in Wilmington, Delaware.

7. Plaintiff Rashad El ("El") is and at all relevant times mentioned herein was, a citizen of the United States and residing in Wilmington, Delaware.

8. Defendant, City of Wilmington ("City"), is a municipal corporation duly organized, existing and operating under and pursuant to the applicable laws of the State of Delaware. The Wilmington Police Department ("WPD") is the law enforcement arm of the City and at all times relevant hereto, was responsible for the policies, customs, practices, supervision, implementation, training, and conduct of its officers. In addition, at all relevant times, the City was responsible for ensuring that its police officers were in compliance with Constitution, the laws of the United States, and of the State of Delaware.

## CLASS ACTION ALLEGATIONS

9. Plaintiffs bring this action pursuant to Rules 23(b)(1), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a Class of similarly situated individuals who were unlawfully handcuffed, transported, searched, and detained based solely on reasonable suspicion by officers of the WPD.

10. The Class that Plaintiffs seek to represent is defined as follows:

> **All persons taken into custody pursuant to the Investigatory Detention Policy of Wilmington Police Department which authorizes officers of the police department to handcuff, transport, search, and imprison persons for a period of up to two hours based only upon reasonable suspicion of a crime during a period lasting from November 22, 2011 to the date on which the**

> **WPD is enjoined from enforcing its policy and custom of unlawfully handcuffing, transporting, searching, and imprisoning citizens based only upon reasonable suspicion, in contravention of the Constitution, the laws of the United States, and the laws of Delaware. Specifically excluded from the class are Defendant and any and all of its respective affiliates, legal representatives, heirs, successors, employees or assignees.**

11. This action has been brought and may properly be maintained as a Class action under Federal law and satisfies the numerosity, commonality, typicality and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

12. The members of the Class are so numerous as to render joinder impracticable. Upon information and belief, there are potentially thousands of people that have been handcuffed, transported, searched, and imprisoned pursuant to WPD's Investigatory Detention Policy based only upon reasonable suspicion -- all of whom are members of the Proposed Class. Upon information and belief, the size of the Proposed Class totals thousands of individuals, some of whom have had their civil rights violated on multiple occasions.

13. Upon information and belief, joinder of all of these individuals is impracticable because of the large number of Class Members and the fact that Class Members are likely dispersed over a large geographical area, with some members presently residing outside of Delaware and this Judicial District. Furthermore, upon information and belief, many members of the Class are low-income persons, may not speak English, and likely would have great difficulty in pursuing their rights individually.

14. Common questions of law and fact exist as to all members of the Class, in that WPD

violated every Class members right to be free from unreasonable searches and seizures guaranteed under the Fourth and Fourteenth Amendment of the United States Constitution by subjecting each Plaintiff to the same longstanding WPD policy and custom of handcuffing, transporting, searching, and imprisoning individuals based solely on reasonable suspicion.

15. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class sustained damages arising out of Defendant's course of conduct. The harms suffered by Plaintiffs are typical of the harms suffered by the Class Members.

16. The representative Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are adverse to the interests of the Members of the Class.

17. Plaintiffs have retained The Norman Law Firm, counsel with substantial experience in the prosecution of civil rights litigation, including successful litigation of civil rights cases against municipalities in Delaware. Plaintiffs' counsel has the resources, expertise and experience necessary to successfully prosecute this action against the City. Counsel for Plaintiffs knows of no conflicts among members of the Class or between counsel and members of the Class.

18. Plaintiffs seek Class Certification under Fed. R. Civ. P. 23(b)(2). Plaintiffs' case merits certification as a (b)(2) Class because it meets all criteria defined by the Supreme Court, the Third Circuit, and this District Court. Specifically, Plaintiffs' case is a civil rights claim seeking broad declaratory and injunctive relief for potentially thousands of individuals, a numerous and amorphous class of persons.[1] In addition, the party opposing

---

[1] Indeed, (b)(2) was "designed for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons". *Barnes v American*

the class, the City, has acted on grounds that apply generally to all members of the class, therefore the indivisible nature of the City's conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them and the declaration and injunction sought will provide relief to each member of the class.

19. Finally, all damages requested are incidental to the primary claim for injunctive and declaratory relief, as the determination of damages will not require additional hearings to resolve the disparate merits of each individual's case will not introduce any new substantive legal or factual issues. In short, all Plaintiffs were harmed in the same way by the same WPD Investigatory Detention policy of handcuffing, transporting, search, and imprisoning.

20. Plaintiffs have standing to assert injunctive relief under the criteria recently defined by the Third Circuit. Plaintiffs have all personally been personally injured by the same WPD policy and are under a continuing daily threat of suffering another injury resulting from the exact same ongoing policy, which WPD officers erroneously believe is Constitutional.

21. Specifically, Plaintiff Wright must encounter the Officer who tackled, handcuffed, searched, and detained him every day as the officer continues to patrol Wright's neighborhood, making the threat of injury very real and immediate for Mr. Wright, nearly every day of his life.

22. In addition to certification under Rule 23(b)(2), and in the alternative, Plaintiffs seek certification under Rule 23(b)(3).

23. Common questions of law and fact exist as to all members of the Class, and predominate over any questions that affect only individual members of the Class. These common

*Tobacco Co.* 161 F.3d 127 (3d. Cir 1998).

Case 1:13-cv-01966-SLR-SRF Document 61 Filed 03/31/16 Page 6 of 20 PageID #: 642

questions of law and fact include, without limitation, the common and predominant question of whether the Defendant's Investigatory Detention policy of handcuffing, transporting, searching, and imprisoning citizens based solely on reasonable suspicion, without regard to the circumstances, is a violation of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

24. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all of the individual members of the Class is impracticable given the large number of Class Members and the fact that they are dispersed over a large geographical area. Furthermore, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them. The cost to the federal court system of adjudicating thousands of individual cases would be enormous. Individualized litigation would also magnify the delay and expense to all parties and the court system. By contrast, the conduct of this action as a Class action in this District presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class.

25. Upon information and belief, there are no other actions pending to address the Defendant's violation of the civil rights of potentially thousands of individuals, even though upon information and belief Defendant has maintained its illegal policy and custom of unlawfully handcuffing, transporting, searching, and imprisoning citizens in contravention of the Constitution, the laws of the United States, and the laws of Delaware.

**FACTS**

**Facts Applicable to the Class Generally**

26. The Fourth and Fourteenth Amendments of the United States Constitution and relevant Federal Law prohibits city officials, such as police officers from engaging in the policy and custom of handcuffing, transporting, searching, and imprisoning citizens based only upon reasonable suspicion. *Glass v. City of Philadelphia*, 455 F. Supp. 2d 302, 347 (E.D. Pa. 2006).

27. WPD has adopted a policy and custom which allows officers to handcuff, transport, search, and imprison citizens based only upon reasonable suspicion that a crime has been committed, regardless of the nature of their charged crime or the circumstances surrounding the search and seizure.

28. Defendant through its 30(b)(6) designee, James Gestwicki, admitted in a prior proceeding that WPD has a policy that allows officers to arrest, transport, handcuff, and search based only on reasonable suspicion and not probable cause. **Exhibit 1.**

29. Officer Gestwicki, the 30(b)(6) deponent testified during his deposition:

    Q:  So reasonable suspicion is enough to handcuff, arrest, take to the station for two hours?

    A:  Handcuff and take to the station. Person hasn't been charged yet.

    Q:  Okay, they haven't been charged?

    A:  They're taken into custody and, again, the handcuffing is for safety reasons.

    Q:  Okay.

    A:  And bring them into the station. It's for safety reasons of the person in custody as well as the officer.

    Q:  Okay, and is that the policy of the Wilmington Police Department?

    A:  Yes. It is.

Q: Is it a written policy or is it –

A. **It's a written policy**. (emphasis added).

Q: Okay. So, once again, reasonable suspicion, if you have a reasonable suspicion, you can be arrested?

A: You can be taken into custody.

Q: And kept for two hours?

A: Yes.

Q: So arrested, handcuffed, transported to the station, and kept for no more than two hours?

A: Taken into custody, handcuffed, transported into the police station, and held for no more than two hours. And that two hours, by the way, is at the time of the stop, not the time of the arrival at the police station.

Q: Okay, and that's based on reasonable suspicion?

A: Yeah, that you believe a crime has been committed will be committed—I forget what the third one is.

Q: okay.

A: Or is about to be committed, I don't know.

Q: Okay. And I forgot to ask, is that a written policy?

A: Title 11. It is a written policy-

Q: That's in Title 11?

A: Yeah, Title 11, and I want to say 1902. **And it is in our written directives also** (emphasis added).

30. Besides Officer Gestwicki, another WPD officer, Ralph Schifano testified in the prior proceeding that WPD has a policy of "investigatory detention" where officers investigating a crime are permitted to transport, handcuff, and take to the police station based on reasonable suspicion alone and not probable cause.

31. Officer Ralph Schifano answered affirmatively under oath that the policy of "investigatory detention" is normal procedure to place persons suspected of a crime in handcuffs and transport them to the police station based only on reasonable suspicion.

32. WPD directive 6.10(K)(1), advises "all personnel…to review the contents of" 11 Del. C. §1902 which the directive terms the "Two Hour Uniform Arrest Law". The directive then states that "[t]his section provides sufficient guidance in the conduct of such detention."

33. 11 Del. C. §1902 does not authorize officers to arrest or take suspects into custody, but rather to briefly detain persons within constitutional limitations based on "reasonable ground".

34. WPD's written directives clearly authorize its officers to exceed the scope of 11 Del. C. §1902.

35. According to WPD's directive 6.10(K)(2) pertaining to the Detention of Suspects, "[m]any people are picked up as suspects in a particular crime. Until they have been identified and arrested, we must remember that they are only suspects. The majority of such detentions result in the person being released without criminal charges being placed. They should not be brought to Central or taken from one location to another, then released to find their own means of transportation. Officers are to offer to transport them back to the location where they were originally stopped and provide them with an explanation of why they were detained.

36. Directive 6.10(K)(3) further states that "[a]t the time of their detention, officers should be mindful that any person suddenly deprived of his freedom may be dangerous, therefore, the proper precautions should always be taken to ensure the officer's safety".

37. Directive 6.10 makes it clear that WPD has a written policy of detaining, transporting, and imprisoning persons merely suspected of a crime based solely on reasonable suspicion.

38. Persons detained under WPD's unconstitutional investigatory detention that were never charged with a crime are readily ascertainable from the Wilmington Department of Police Turnkey Prisoner Log ("Turnkey Log"). **Exhibit 2.**

39. Persons transported, searched, handcuffed, and imprisoned at the jail under the Investigatory Detention policy have "n/a" in the "charge(s)" column since they were never charged with a crime.

40. Additionally, persons never charged with have "ID" listed in the "disposition" column.

41. Upon information and belief, ID stands for investigatory detention.

42. Other persons reflected in the Turnkey Log likely were detained pursuant to the investigatory detention policy since no charges were ever stated in the "charge(s)" column.

43. Additionally, prisoners charged with resisting arrest in the "charge(s)" column with no underlying charge to support the initial detention also were likely taken into custody pursuant to WPD's unconstitutional investigatory detention policy.

44. Officer Schifano testified during his deposition that at least one person charged with "resisting arrest" listed in the "charges" column was detained pursuant to WPD's investigatory detention policy.

45. Pursuant to this WPD policy and custom each member of the Class, including the named Plaintiffs, were handcuffed, transported, searched, and imprisoned based only on reasonable suspicion that they had committed a crime.

46. As a direct and proximate result of the unlawful policy and custom of WPD handcuffing, transporting, searching, and imprisoning individuals based only on reasonable suspicion, each member of the class, including the named Plaintiffs -- has suffered a loss of their liberty, physical injuries, psychological pain, humiliation, suffering and mental anguish.

### Facts Applicable to the Named Plaintiffs

### Jayvon Wright

47. On November 23, 2011, Wright was near his home with his mother and uncle when he saw his friend Eduardo Griffin ("Griffin") being searched over the hood of a police vehicle by Officer Devon Jones ("Jones").

48. Wright walked towards his friend, stopping about 8 to 10 feet from him, and asked Griffin if he needed him to call his parents for him.

49. At which point Jones responded aggressively, "what the fuck do you want, shouldn't you be playing basketball."

50. Wright turned to walk away when Jones grabbed his arm from behind and tackled him to the ground.

51. Jones assaulted Wright on the ground for a period of three to five minutes.

52. During the assault Wright screamed to Jones, asking him what he was doing.

53. Jones never answered Wright's inquiries.

54. Nor did Jones answer the screams of Wrights mother and uncle who stood directly next to where Wright was being assaulted on the ground by Jones.

55. Likewise, their screams to Jones's partner, Officer Crocker ("Crocker"), went unheeded as he sat quietly by and watched.

56. While the assault was occurring, two other officers arrived on the scene, witnessed the

incident, and subsequently left.

57. In addition, during the assault, Griffin, the suspect Jones had been searching over the hood of his car, simply walked away from the scene.

58. After the assault, Jones placed his boot on Wright's back and handcuffed him.

59. Jones then searched through all of Wright's pockets without obtaining Wright's consent.

60. Wright was never informed that he was under arrest or what, if any, crime he was suspected of committing.

61. Jones then placed Wright into the back of the police car and transported Wright to the WPD police station.

62. When Wright arrived at the station the officers handcuffed him to a bench while they performed an inventory search of his personal effects.

63. Wright was then transferred into a jail cell, where the handcuffs were removed.

64. While in the cell Wright was told that he was being charged with resisting arrest.

65. During his time in the cell he was never questioned regarding any matter.

66. Wright was released roughly after two hours in jail.

67. He was charged with two misdemeanors, loitering and disorderly conduct.

68. Both charges were dismissed prior to trial without any concession by Wright.

69. Wright was never charged with resisting arrest.

70. Wright sees and encounters Jones on a near daily basis in his neighborhood and is under constant fear that he will be subjected once again to the same unlawful policy of WPD, potentially from the very same officer.

**Keith Medley & Antoine Murrey**

71. On or about the afternoon of March 15, 2013, Medley and Murray were waiting in a

friend's apartment prior to picking up Medley's son who attended Odyssey day school across the street.

72. At approximately 3:30 Medley and Murrey exited the friend's apartment to walk across the street to pick up Medley's son.

73. As they left the building, WPD officers emerged from three vehicles with guns drawn.

74. The officers told the two men to get down on the ground immediately.

75. Both men complied with the officers' request and laid face down on the pavement.

76. Upon information and belief two of the officers present were Officer Barnes and Officer Mullings.

77. The Officers handcuffed Medley and Murrey and patted them down for weapons.

78. The Officers then proceeded to search Medley and Murrey.

79. An Officer removed a cigarette pack from Medley's pocket and opened it, finding nothing but cigarettes inside.

80. One of the officer's took Murrey's car keys and phone from his pocket.

81. While Medley and Murrey were detained, the officer entered Murrey's car, started it, and then circled the block a few times in the car.

82. The officer then searched the entire car, finding nothing.

83. The officers at the scene asked which apartment Murrey and Medley were coming from.

84. Murrey and Medley responded that they were in a friend's apartment in the building.

85. The police then escorted Murray and Medley, still handcuffed, back into the apartment complex and into the apartment unit where the police *assumed* the men exited from.

86. The Officers then took Murrey to a back bedroom where the handcuffs were removed.

87. He was then forced to remove all of his clothing in front of three officers.

88. During this strip search, one of the officers brandished a taser several inches away from Murrey.

89. Murrey was told that if he moved he would be tased immediately by the officer next to him.

90. The officers proceeded to search his mouth.

91. The officers then instructed him to pull apart his buttocks.

92. Finding nothing the officers told Murrey to redress.

93. After he dressed he was once again handcuffed.

94. The officers then returned Murrey to the living room of the unit.

95. Police then took Medley to the same back bedroom.

96. In the bedroom the officers took the handcuffs off Medley.

97. He was then forced to remove all of his clothing in front of three officers.

98. One of the officers brandished a taser as Medley undressed.

99. Medley was instructed that if he moved he would be tased immediately by the Officer next to him.

100. The officers proceeded to search his mouth.

101. The officers then instructed him to pull apart his buttocks.

102. Finding nothing, the officers then told Medley to redress.

103. Medley was then handcuffed and returned to the living room.

104. The officers then proceeded to search the entire apartment.

105. None of the officers ever showed Medley or Murrey a warrant for the search of the apartment or for any other purpose.

106. The Officers seized a cell phone and a pair of bolt clippers from the apartment.

14

107. Upon information and belief, the Officers located no weapons or contraband.

108. Medley and Murrey were then transported to the Police station.

109. Medley and Murrey were imprisoned at the station in a cell for approximately one hour.

110. The two men were then subsequently released with no charges filed.

111. Neither Medley, nor Murrey was ever provided a reason why they were handcuffed, searched, strip searched, transported, and imprisoned.

112. Medley had to subsequently describe to his 6 year old son why he was handcuffed at gunpoint.

**Gregory Griffin and Rashad El**

113. On February 3, 2013, Gregory Griffin ("Griffin") and Rashad El ("El") were confronted by four WPD officers including Officer Andrew Schaub around the intersection of Lobdell and Chapel Streets in the Southbridge neighborhood of Wilmington.

114. The officers asked both Griffin and El "which way did they go?"

115. Griffin responded "I don't know-I didn't see anything".

116. The officers responded to Griffin's comments by taking both men into custody.

117. None of the officers advised Griffin or El why they were being taken into custody.

118. One officer handcuffed Griffin and placed him into a police vehicle

119. Griffin was then transported him to the police station.

120. Another officer handcuffed El and placed him into a police vehicle.

121. El was then then transported to the police station.

122. Griffin was handcuffed to a bench at the police station.

123. The officers searched Griffin's body until a commanding officer interrupted the officers and apologized to Griffin.

124. El was handcuffed to a bench at the police station.

125. The officers searched El's body at the police station.

126. Neither man was ever told why they were taken into custody.

127. Neither man was ever charged with a crime.

### **COUNT I:  VIOLATION OF 42 U.S.C. §1983 *MONELL CLAIM***

128. Plaintiffs re-allege and incorporate by reference the allegations, above and below, as though fully set forth herein.

129. The City is a state actor for purposes of §1983 litigation.

130. The violation of Plaintiffs' rights was caused by the policy and custom of the WPD of handcuffing, searching, transporting, and imprisoning individuals suspected of a crime based solely on reasonable suspicion.

131. The policy and custom of the WPD violated federal law and was a moving factor behind Plaintiffs' injuries.

132. Additionally, prior to the events described herein, Defendant City developed and maintained ordinances, policies, practices and/or customs exhibiting deliberate indifference to the constitutional rights of persons within the geographic and jurisdictional limits of the City of Wilmington, which caused violations of Plaintiff's constitutional rights.

133. Specifically, Defendant City failed to adequately and properly supervise and train its police officers in various aspects of law enforcement procedure, including but not

limited to, the nature and existence of probable cause, on the constitutional limitations on investigative stops, detentions, searches and seizures, and on the Laws of Delaware.

134. The above-described acts and omissions by Defendant City demonstrated a deliberate indifference to the constitutional rights of citizens of Wilmington, and were the direct and proximate cause of the violations of Plaintiff's rights as set forth herein.

135. Plaintiffs bring this class action on behalf of themselves, and others similarly situated, against The City of Wilmington for violations of their Fourth and Fourteenth Amendment rights caused by the WPD formally adopted policy and custom of handcuffing, transporting, searching, and imprisoning individuals based only upon reasonable suspicion. This policy and custom is in clear contravention of Fourth and Fourteenth Amendment to the Constitution, Federal Law, and the laws of Delaware. As such, the City of Wilmington is directly liable for the damages of Plaintiff and members of the Class.

136. As a direct and proximate result of the unconstitutional acts described above, Plaintiff and the Members of the Class have been deprived of their liberty and have been irreparably injured.

## COUNT II:  DEMAND FOR DECLARATORY JUDGMENT

137. Plaintiffs re-allege and incorporate by reference the allegations, above and below, as though fully set forth herein.

138. The policy and custom of the WPD to handcuff, transport, search, and imprison individuals based only upon reasonable suspicion is clearly unconstitutional and violates the Fourth and Fourteenth Amendments of the Constitution. This policy is in clear violation of the Fourth Amendment guarantee against unreasonable searches and seizures, and gives rise to plaintiffs claims pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983.

139.    Plaintiff and Members of the Class request that this Court issue a declaratory judgment, and that it declare the handcuffing, transport, search, and detainment of individuals based only upon reasonable suspicion is unconstitutional and a violation of the Fourth and Fourteenth Amendments of the Constitution.

## COUNT III:  DEMAND FOR PRELIMINARY AND PERMANENT INJUNCTION

140.    Plaintiffs re-allege and incorporate by reference the allegations, above and below, as though fully set forth herein.

141.    The policy, custom and practice of the City is clearly unconstitutional and in violation of Fourth Amendment guarantee against unreasonable searches and seizures, and gives rise to plaintiffs claims pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983.

142.    This policy is longstanding and is currently in place, with new and/or prospective Members of the Class being subjected to the harms that have already been inflicted upon Plaintiffs.

143.    The ongoing use of this unconstitutional WPD policy causes irreparable harm to the new and/or prospective Members of the Class every day it is permitted.

144.    Therefore, Plaintiff requests that the Court issue an order requiring the City and WPD to immediately desist from their unconstitutional policy and custom of handcuffing, transporting, searching, and imprisoning, individuals based only upon reasonable suspicion and seeks both a preliminary and permanent injunction from this Court ordering as much.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jayvon Wright, Antoine Murrey, Keith Medley, Gregory Griffin, and Rashad El on behalf of themselves and of a Class of others similarly situated, requests that this Honorable Court grant them the following relief against Defendant City of Wilmington:

1. An order certifying this action as a Class Action pursuant to Fed. R. Civ. P. 23.

2. A judgment against Defendant City of Wilmington on Plaintiff's First and Second Causes of Action detailed herein, awarding damages to Plaintiffs and each Member of the Proposed Class in an amount to be determined by a jury and/or the Court on both an individual and a Class-wide basis.

3. A declaratory judgment declaring the Defendant's Investigatory Detention policy and custom of handcuffing, transporting, searching and detaining individuals based only upon reasonable suspicion to be unconstitutional.

4. A preliminary and permanent injunction enjoining the Defendant from continuing its Investigatory Detention policy and custom of handcuffing, transporting, searching, and detaining individuals based solely on reasonable suspicion.

5. All lawful damages, including compensatory damages in an amount to be determined, against Defendant.

6. All attorneys' fees and the costs of this action, pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 23 including pre and post-judgment interest.

7. Nominal Damages.

8. Such other relief as this Court deems just and equitable.

9. Trial by Jury.

                                      **THE NORMAN LAW FIRM**

                                      */s/ Stephen P. Norman*
                                      Stephen P. Norman, Esquire, Bar. No. 4620
                                      The Norman Law Firm
                                      30838 Vines Creek Road, Unit 3
                                      Dagsboro, DE 19939
                                      (302) 537-3788
                                      snorman@thenormanlawfirm.com
DATE: August 27, 2014                    *Attorney for Plaintiffs*