IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAYVON WRIGHT, ANTOINE MURREY,       *
KEITH MEDLEY, GREGORY GRIFFIN,       *
AND RASHAD EL, INDIVIDUALLY,         *   CASE NO. 13-1966-GAM/SRF
And on behalf of a Class of others similarly   *
situated,                            *
                                     *
                                     *
          Plaintiffs,                *
                                     *
          v.                         *
                                     *
City of Wilmington,                  *
                                     *
          Defendant                  *

**REPLY TO DEFENDANT CITY OF WILMINGTON'S OPPOSITION
TO UNSEAL JUDICIAL RECORDS**

To the following via email:

| | |
|---|---|
| Rosamaria Tassone-DiNardo<br>City of Wilmington Law Department<br>City/County Building, 9th Floor<br>800 N. French Street<br>Wilmington, DE 19801 | C. Malcolm Cochran, IV (#2377)<br>Kelly E. Farnan (#4395)<br>Christine D. Haynes (#4697)<br>Richards, Layton & Finger, P.A.<br>920 N. King Street<br>Wilmington, DE 19801 |
| Stephen P. Norman<br>The Norman Law Firm<br>30838 Vines Creek Road, Suite 3<br>Dagsboro, Delaware 19939 | Ryan Tack-Hooper<br>ACLU Foundation of Delaware<br>100 West 10th Street, Suite 706<br>Wilmington, DE 19801 |

Weih (Steve) Chang
122 Pumpkin Patch Lane
Hockessin, DE 19707

DATED: **January 2, 2019**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES     i

INTRODUCTION     1

THE WHITE PRIVILEGE THEORY, SELECT HISTORIC CASES,
AND CASES IN THE DISTRICT OF DELAWARE     2, 5, 10

ARGUMENT

I.    PROPOSED INTERVENOR HAS STANDING TO SEEK
     ACCESS TO JUDICIAL RECORDS     13

     A. PROPOSED INTERVENOR MET RULE 24(A)
       REQUIREMENT BECAUSE HE HAS AN UNCONDITIONAL
       RIGHT TO ACCESS UNDER THE CONSTITUTION     13

     B. PROPOSED INTERVENOR MET RULE 24(B)
       REQUIREMENT BECAUSE HE WAS SUBJECT TO
       DEFENDANT'S MISCONDUCT UNDER THE SAME WHITE
       PRIVILEGE     14

     C. DESPITE THE PUBLIC INTEREST THE LEGAL STANDARD
       TO DENY PUBLIC ACCESS TO THIS CLASS ACTION HAS
       NOT BEEN OPENLY APPLIED WITH STRICTNESS     15

     D. PUBLIC INTEREST LITIGATION ARISING FROM WHITE
       PRIVILEGES PARTICULARLY DESERVES OPEN AND
       TRANSPARENT JUDICIAL PROCEEDING IN THE
       INTEREST OF EQUAL JUSTICE UNDER LAW     16

II.    THE PROPRIETY OF SEALING RECORDS REMAINS
     SECRETIVE TO THE PUBLIC     16

III.   THERE IS NO BASIS TO CONTINUE SEALING RECORDS AS
     EQUAL JUSTICE CANNOT BE DISPENSED FROM BEHIND
     A CURTAIN OF SECRECY     18

CONCLUSION     20

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*McDole v. City of Wilmington* .......................................... 1

Delaware Attorney General's Opinion No. 17-IB01
re: *Lateef Dickerson v. City of Dover* ............................... 1

*Chang v. City of Wilmington* ........................................... 3

*Dred Scott v. Sandford* .................................................. 3

*Chinese Exclusion Act* ................................................... 3

*ex parte Crow Dog* ....................................................... 5

*Yick Wo v. Hopkins* ...................................................... 6

*Korematsu v. USA* ....................................................... 7, 8, 9

*Youngstown Sheet & Tube Co. v. Sawyer* ........................ 7, 8, 9

*Bulah v. Gebhart* ......................................................... 11

*Belton v. Gebhart* ........................................................ 11

*Coalition for Education Reform v. Indian River School District* ... 12

*Delawareans for Educational Opportunity and NAACP Delaware v. Carney* ... 12

*Delaware Community Reinvestment Action Council, Inc v. Markell* ... 13

*2008 Search Warrant Application on Dr. Earl Bradley* ......... 17

*FISA Warrant Applications on Trump Presidential Campaign* ... 17, 18

**RULES**

Fed. R. Civ. P. 24 ........................................................ 13, 14

# INTRODUCTION

Proposed Intervenor Weih Steve Chang respectfully requests that the Court recognize his standing under Rule 24(a), Rule 24(b), and the Constitution of the United States and grant him status as Intervenor for the limited purpose of unsealing judicial records of the above-captioned class action.

In a sharp contrast to *McDole v. City of Wilmington*, in which the City of Wilmington ("City") promptly settled with the family of the deceased for the purpose of minimizing public disclosure of police brutality, the City spent an exorbitant amount of taxpayer's money on Delaware's most expensive attorneys for the purpose of defending an unlawful practice of racial harassment that plays no role in making the communities safer. Taxpayers and the general public have the right to know how much and why. Indeed, pursuant to Delaware's Attorney General Opinion No. 17-IB01 re: *Lateef Dickerson v. City of Dover,* settlement terms and attorney fees funded by taxpayers are subject to public disclosure. By the City's own choosing the above-captioned case has been litigated since November 21, 2013. For over five years the City succeeded in keeping crucial, relevant portions of its disclosures and arguments as contained in the judicial record from public access. Now, in its Opposition the City seems to have accepted Proposed Intervenor's qualified First Amendment right of access, at least with respect to the sealed materials in connection with the motion for class certification (see City Opposition

Page 14 and Footnote 6). The City even engaged in "a comprehensive re-review (and re-redaction) project." (see City Opposition Page 1)  For this reason alone, the Court should grant Proposed Intervenor's motion at least in part and proceed immediately to identify specific and relevant records eligible for immediate disclosure.

It is the City's burden to provide a compelling reason to deprive the public of access to its record and it has not done so.  Instead, the City still continues to oppose Proposed Intervenor's standing under Rule 24(a) and 24(b) in the hope of depriving him of his undisputed First Amendment and common law right of access to public court records.  In further response, Proposed Intervenor respectfully introduces, among other legal and factual grounds, his legal theory of White Privilege ("White Privilege") in support of his standing.

## THE WHITE PRIVILEGE THEORY

In *Wright v. City of Wilmington*, the plaintiffs set forth common questions of law and fact including, without limitation, "the common and predominant question of whether the Defendant's Investigatory Detention policy of handcuffing, transporting, searching, and imprisoning citizens based solely on reasonable suspicion, without regard to the circumstances, is a violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution."

2

In *Chang v. City of Wilmington*, the plaintiffs set forth, in part, the same claims "pursuant to 42 U.S.C. § 1983 to redress the deprivation by the Defendant (WPD), acting under color of state law, of rights, privileges and immunities secured to the Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of the United States."

In its Opposition, City claimed "Mr. Chang does not have an interest in the outcome of" *Wright.* and *Chang* "has no relationship with this [*Wright*] action." This argument is not only misplaced, but also is historically innacurate.  It is as if *Dred Scott* decision (1857) had no relationship with the *Chinese Exclusion Act* (1882). Quite the opposite, the unconstitutional, extrajudicial  force of law behind both the *Dred Scott* case and the *Chinese Exclusion Act* was that of White Privilege. That White Privilege is the same common force of law behind *Wright* and *Chang,* today.

## The Legal Definition of White Privilege

The definition of White Privilege, as with many terms, varies from source to source, but is generally distinguished from active bias or prejudice against non-white people. In legal terms, White Privilege can defined as a three-tiered discretionary power.

Legislative Tier:  In the legislative branch of American government, the White Privilege is a seen or unseen discretionary power exercised by the white

3

majority and its proxies, driven by unconscious or overt racial bias, in enacting laws
that unintentionally or intentionally favor the white majority at the expense of
minorities.

Administrative Tier:  In the administrative branch of American
government, White Privilege is a seen or unseen discretionary power exercised by
the white majority and its proxies, driven by unconscious or overt racial bias, in
enforcing laws, of various varieties, through customs or policies or in a manner that
favor the white majority at the expense of minorities.

Judicial Tier:  Historically and over time, appellate courts in both state and
federal judiciaries have corrected numerous cases of racial injustice referred to by
vindicating and expanding the rights of minorities. In 1932 the United States
Supreme Court approved the phrase "EQUAL JUSTICE UNDER LAW" to be
engraved on the front of its building to represent a societal ideal and the egalitarian
principle that all men are created equal.

In the state and federal judicial branches of American governments, with
the exception of many federal and state appellate courts, White Privilege is a seen or
unseen discretionary power exercised by the white majority and its proxies, driven
by subliminal, unpronounced, or unconscious racial bias, in administrating justice
procedurally or substantively in manners that intentionally or inadvertently  deprive
minorities of their constitutional rights and privileges.

The three tiers of White Privileges may operate independently from each other or co-operate with each other.

The White Privilege theory legally defines the custom of abusing discretionary power under color of law to deprive minorities of their constitutional rights, and therefore qualifies as a legal question of law under the 14th Amendment. Both *Wright* and *Chang* asserted the 14th Amendment claims.

**Select Historic Cases of the White Privileges**

American slavery was a product of all three tiers of White Privilege working in tandem. It was defeated only through the American Civil War from 1861 to 1865.

The dispute in 1974 between Spotted Tail and Government concerning the 1868 Treaty of Fort Laramie illustrate one of the earliest examples of three-tiers of White Privilege. Spotted Tail's subsequent death, caused by another Native American, Crow Dog, initiated the nation's first critical debate on the fairness in the white majority's discretionary powers to make, enforce and adjudicate laws governing Native Americans.

In *ex parte Crow Dog* (1883), Justice Stanley Matthews delivered the opinion of the unanimous court. Justice Matthews stated:

> It tries them, not by their peers, nor by the customs of
> their people, nor the law of their land, but by superiors
> of a different race, according to the law of a social
> state of which they have an imperfect conception, and

> which is opposed to the traditions of their history, to
> the habits of their lives, to the strongest prejudices of
> their savage nature; one which measures the red man's
> revenge by the maxims of the white man's morality.

Today, the division of power between federal courts and Indian tribal courts reflects the on-going debate.

Signed in 1882, the Chinese Exclusion Act was one of the earliest cases of three-tiered White Privilege. The government of California prevented Chinese immigrants from working by requiring certain permits that they could not obtain and passed legislation to prevent naturalization. Many turned to the laundry business and in San Francisco about 89% of the laundry workers were of Chinese descent. It was often the only job Chinese could find.

In *Yick Wo v. Hopkins* (1886), the statute at issue was promulgated to support existing White Privilege, enforced under the White Privilege theory, and overturned by the Supreme Court under the 14th Amendment. The Court, in a unanimous opinion written by Justice Matthews, found that the administration of the statute in question was discriminatory and that there was therefore no need to even consider whether the ordinance itself was lawful.

Despite the obvious analogies, the principles underlying *Yick Wo* were never applied to the Jim Crow laws (1877-1955) which, although also racially neutral, were in practice discriminatory against blacks.

6

The Jim Crow laws period represents the longest period in American history when laws at the three tiers of American governments respectively and inter-operatively were made, enforced and upheld under the White Privilege theory.

In the case of Rosa Parks (1955), it must nevertheless be noted that it is the discretionary power at the enforcement level of the Montgomery City code, not the "Separate but Equal" precept, that sparked the civil rights movement. The city code did not specify where the line of separation by races on its buses should be. The bus driver, James Blake, at his discretion, used a movable sign during rush hours.  the movable sign by Blake sometimes drove all black passengers off the bus as more whites came aboard. The original goals in the Montgomery Bus Boycott led by Martin Luther King Jr. were very minor... a fixed dividing line between the black and white sections on the buses, which would effectively take away Blake's racially motivated discretionary power.

Although *Korematsu v. USA* (1944) and *Youngstown Sheet & Tube Co. v. Sawyer* (1952) involve identical legal rights, the Supreme Court ruled differently in *Korematsu* with a seemingly unconscious racial bias towards Japanese Americans.

In 1983, a pro bono legal team with new evidence re-opened the 40-year-old *Korematsu* case in a federal district court on the basis of government misconduct.  They showed that the government's legal team had intentionally suppressed or destroyed evidence from government intelligence agencies reporting

that Japanese Americans posed no military threat to the U.S. Withholding or fabricating evidence is the widely adopted discretionary practice by the administrative branch in treating minorities.

Although the district court ruling cleared Korematsu's name, the Supreme Court decision still stands.  Writing for the majority, Justice Hugo Black held that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect" and subject to tests of "the most rigid scrutiny," not all such restrictions are inherently unconstitutional. "Pressing public necessity," he wrote, "may sometimes justify the existence of such restrictions; racial antagonism never can."

Although *Korematsu* was the first instance of the Supreme Court applying the strict scrutiny standard to racial discrimination by the government, nevertheless, in comparison to the *Youngstown Steel* case, the highest court did not apply "the most rigid scrutiny" and treated Japanese Americans in the least favorable light.

The Third Amendment to the United States Constitution places restrictions on the quartering of soldiers in private homes without the owner's consent, forbidding the practice in peacetime. The amendment is a response to Quartering Acts passed by the British parliament during the buildup to the American Revolutionary War, which had allowed the British Army to lodge soldiers in private residences.

In one of the seven opinions in *Youngstown Sheet & Tube Co. v. Sawyer*,
Justice Robert H. Jackson cited the Third Amendment as providing evidence of the
Framers' intent to constrain executive power even during wartime:

> [t]hat military powers of the Commander in Chief
> were not to supersede representative government of
> internal affairs seems obvious from the Constitution
> and from elementary American history. Time out of
> mind, and even now in many parts of the world, a
> military commander can seize private housing to
> shelter his troops. Not so, however, in the United
> States, for the Third Amendment says...[E]ven in war
> time, his seizure of needed military housing must be
> authorized by Congress.

In *Korematsu*, pursuant to Executive Order 9066, the War Department was
authorized to create military areas from which any or all Americans might be
excluded. Public Proclamation No. 1, demarcated western military areas and the
exclusion zones therein, and directed any "Japanese, German, or Italian aliens" and
any person of Japanese descent to inform the U.S. Postal Service of any changes of
residence.  Further military areas and zones were demarcated in Public Proclamation
No. 2.

Executive Order 9066 effectuated separation of property owners of any
race or ethnicity from ordinary access and use of their properties for the purpose of
war. By the military order, the military forces, or soldiers, became the default and de
facto occupiers of the properties of evacuees in the declared military zones. For

117,000 persons of Japanese ancestry interned, the seizure of a person operated as a seizure of his/her properties. The Supreme Court applied the rigid scrutiny under the Third Amendment in *Youngstown Sheet & Tube Co. v. Sawyer* but not in *Korematsu.*

As in the disputes between Spotted Tail and Government on the 1868 Treaty of Fort Laramie, Japanese Americans' property interests guaranteed under the highest law of the land and from the earliest elementary American history were infringed upon with the blessings of the judicial branch which failed to employ its strict scrutiny standard when it considered the case. For this reason, the precedent of depriving minorities of property interests in wartime, as established by *Korematsu,* must be overturned in its entirely.

## Cases in the District of Delaware

American slavery and "Black Code" represent the first coming of White Privilege as a legal construct in overtly codified forms, which became the genesis of the 14th Amendment. (Meanwhile, the equally brutal treatment of Native American and expropriation of Native land under the White Privilege doctrine did not produce as large a body of legal records that exist for slave trade and slave-related property disputes.)

Jim Crow laws, as a legal construct, represent the second iteration of White Privilege. They were enacted under the guise of "separate but equal". In reality

however, they were merely a subterfuge used to codify the existing "White Privilege" ethos that had pervaded the rules and customs of the formerly slave states, including Delaware. The unannounced purpose of calling themselves "equal" in Jim Crow laws is to prevent minorities from seeking remedy under the 14th Amendment and indeed under Jim Crow. This second coming of White Privilege persisted from 1877 until sometime between 1955 and 1965. Delaware's noted cases include *Bulah v. Gebhart* and *Belton v. Gebhart*.

The "New Jim Crow" era represents the third coming of White Privilege as defined by Proposed Intervenor. This third coming is a legal construct grand-fathered by "black codes" and fathered by Jim Crow laws. The three-tiered discretionary power, seen or unseen, no longer overt, operating independently or interdependently, exercised by white government actors under color of law, has proven to be equally effective in depriving minorities of constitutional rights and privileges.

For example, mass incarceration of minorities in Delaware is one of many symptoms of white privilege in this formerly slave state. On November 10, 2013 at the First Unitarian Church in Talleyville, seven African-American judges from four different courts appeared on a stage together as part of a forum on race and the criminal justice system. The gathering was organized by the Coalition to Dismantle the New Jim Crow, a joint project of several area churches. Chief U.S. District

11

Court Judge Gregory M. Sleet told the crowd "I believe there is a fatal flaw in Delaware's death penalty system."  On November 21, 2013, Jayvon Wright, Antoine Murrey and Keith Medley filed this class action complaint against City of Wilmington Police Department, which has been a major player of Delaware's criminal justice system that mass-incarcerates African Americans.

White Privilege is prevalent outside Delaware's criminal justice system.  In *Coalition for Education Reform v. Indian River School District* (2016), minority plaintiffs alleged that Indian River School District abused its administrative discretion and "historically used Carver [school] as a punitive dumping ground for African-American students, removing them from its mainstream schools and sending them to Carver in disproportionate numbers on flimsy pretexts, segregating them at Carver on arbitrary grounds and for arbitrary periods of time…does not treat Caucasian students the same way."

In *Delawareans for Educational Opportunity and NAACP Delaware v. Carney* (2018), the plaintiffs alleged that Delaware through its legislative powers and administrative discretion has perpetuated policies that "concentrated disadvantaged students, primarily students of color, in the lowest-funded schools and diluted the political power of their parents" and "[t]he effect of these policies is to place the most disadvantaged students in racially segregated, high poverty

12

schools, which are the same schools least served by the education policies of the state."

In *Delaware Community Reinvestment Action Council, Inc v. Markell* (2015), the minority plaintiffs alleged that the Governor and the General Assembly abused their respective administrative and legislative powers by undermining a pre-agreed implementation plan of a settlement with Bank of America for its role in the 2008 mortgage crisis and by diverting $31.6 million of the Settlement Funds, intended for rebuilding the poor and disadvantaged communities. Instead, the State allocated the funds for general budgetary purposes, including purposes totally unrelated to the mortgage crisis, such as farmland preservation.

These recent cases in the District of Delaware are similar to *Wright v. City of Wilmington* with respect to the applicability of the White Privilege theory, the public interest, and the representation of a certifiable group of minorities. The judicial records of these recent cases are open to the public.

## ARGUMENT

### I. Proposed Intervenor Has Standing to Seek Access to Judicial Records

#### A. Proposed Intervenor Met Rule 24(a) Requirement Because He Has an Unconditional Right to Access under the Constitution

The public's right to access civil trials under the First Amendment is undisputed and Proposed Intervenor is a member of the public regardless of his race, color, nationality, or familial status.

Furthermore, because *Wright* was brought as a class action and is being litigated as a public-interest case (upon appearance of ACLU), and can be legally determined as a white-privilege case, any incarcerated person having been subject to the City's law enforcement action has the right to know regardless of his/her legal representation.

*Chang* and *Wright* both contain 14th Amendment claims. Proposed Intervenor (1) filed a timely application; (2) shares an interest in the subject matter of the proceedings; (3) can be reasonably foreseen to be impaired by disposition of *Wright;* and (4) is not represented by the existing parties. Indeed, the City kept so many crucial and relevant portions of the judicial records from public access that it is impossible for Proposed Intervenor to produce a comprehensive list of judicial records to unseal at this juncture.

B.  Proposed Intervenor Met Rule 24(b) Requirement Because He Was Subject to Defendant's Misconduct under the Same White Privilege

The Court should take judicial notice that the named individual defendants in the City in *Wright* and *Chang* are Caucasians and that the plaintiffs are minorities.

The conduct by the white defendants involves subjects taken into custody, witnesses, informants, undercover officers, surveillance and law enforcement methods, confidential (by statute) criminal history information, and other sensitive material administratively produced government records as police reports in LEISS and DELJIS. Under White Privilege, as alleged by Proposed Intervenor, the City

14

allowed fabrication and tampering of police reports by white police officers and allowed fabricated police reports to be used as the basis for detaining or pressing charges against minorities including Proposed Intervenor.

Proposed Intervenor (1) has an independent basis from *Wright* for subject matter jurisdiction of White Privilege in violation of the 14th Amendment; (2) filed a timely motion, and (3) has common questions of law and fact of similar police misconduct when compared to the primary litigation, *Wright*.

C.   Despite the Public Interest the Legal Standard to Deny Public Access to This Class Action Has Not Been Openly Applied with Strictness

The City admitted that "the Court's Memorandum Order [to seal] was initially issued under seal and indicated that it would be filed publicly unless the parties jointly submitted a redacted version within ten days. Neither party requested redactions but the Memorandum Order has not been publicly filed." (see City Opposition Page 4 and Footnote 3). This violation of the Court's order by the parties should not and can not be ignored. The proper sanction for such conduct is the unsealing of the records in question. Such a sanction is not only appropriate here, but will also serve to foster respect by parties for the legitimate orders of the courts and also deter similar conduct in the future.

Any member of the public can reasonably conclude that (1) the public's right to access judicial records are not being adequately represented by the existing

parties; (2) the legal standard the Court applied to seal records remains a secret

itself; and (3) the strictness of the legal standard for the purpose of diminishing the

possibility of injustice, incompetence, perjury, or fraud upon the court is beyond the

appraisal of class members or the public.

> D.   Public Interest Litigation Arising from White Privilege Particularly
> Deserves Open and Transparent Judicial Proceedings in the Interest
> of Equal Justice Under Law

The participation on a forum about the New Jim Crow Era by seven

African-American judges from four different courts in this jurisdiction has proven

that the legal theory of White Privilege is a legal construct applicable to all three

branches of government.

Secrecy erodes the legitimacy of the institution of the courts. The fact that

*Wright* is under seal and that other similar class actions such as *Coalition for*

*Education Reform v. Indian River School District*, *Delawareans for Educational*

*Opportunity and NAACP Delaware v. Carney*, and *Delaware Community*

*Reinvestment Action Council, Inc v. Markell* are litigated in open proceedings

indicates a two-tier system, open and closed, and this threatens the public

confidence in the accuracy of judicial records, the authority of the court's rulings,

and the respect due its judgments.

**II.    The Propriety of Sealing Records Remains Secretive to the Public**

In its Opposition the City failed to recognize that there is a material

difference between protective orders under Federal Rule of Civil Procedure 26 and orders to seal judicial records. The former relates to discovery between the parties, whereas the latter concerns material that has been placed in the court record.  A party cannot file documents under seal simply because they were originally produced pursuant to a Rule 26 protective order.

When actions or inactions by government actor(s) caused severe harm and injury to a certifiable class of the general public, the public has the right to see relevant  government records regardless of how sensitive they might be. Judge Colm F. Connolly once commented on the repeated inactions by Delaware's prosecutor(s) during the 2008 investigation of America's worst pedophile, Dr. Earl Bradley. Mr. Connolly in 2010 stated that "it's incomprehensible that a prosecutor would not try to stop the further abuse of children for fear of jeopardizing the investigation…this is inexcusable and too many people have paid a horrible price for the lack of judgment."  Indeed, the sworn application by Delaware's state police for a search warrant on Bradley's office in 2008 contains sensitive materials of witnesses, informants, law enforcement methods, and history of criminal complaints. The sensitive information supports Mr. Connolly's assessment of "a horrible price" paid by the specific class of citizens.  The propriety of sealing the sworn application remains unknown to the public today.

Recently, President Donald J. Trump declared that he would declassify

highly sensitive FISA warrant applications and other confidential documents from Special Counsel Robert Mueller's investigation, which President said would expose efforts by the FBI and the Justice Department to set him up. The court will likely intervene if President decides to move forward with his threat to declassify. Considering 62,979,636 citizens voted for Donald J. Trump the court will have to balance conflicting claims by President and FBI/DOJ/Special Counsel and to publish its decision on the propriety to either continue to classify or declassify the confidential documents in question.

The legal standard that provides the Court with inherent power over its records supplies the authority to consider a claim of legal right to release of those records.  Proposed Intervenor respectfully requests that the Court make a public ruling on the propriety to continue sealing the judicial records on the docket in *Wright*. Proposed Intervenor is immediately interested in records with respect to class certification and authenticity and truthfulness of various police reports and other government records.

III.   **There Is No Basis to Continue Sealing Records as Equal Justice Cannot Be Dispensed from Behind a Curtain of Secrecy**

*Wright* as a class action is a paradigm example of White Privilege litigation under the 14th Amendment. Congress specifically intended to address White Privilege when it enacted the 14th Amendment. At its origin and by its core principle, the 14th Amendment provides a federal remedy to address White Privilege

as exercised by government actors against African Americans and other minorities.

Historically secrecy in each or all of the three branches of government has never benefited minorities. In *Korematsu*, the government's legal team intentionally suppressed or destroyed evidence from its own intelligence agencies reporting that Japanese Americans posed no military threat to the U.S. The intelligence reports remained secretive for 40 years during which Japanese Americans were under constant suspicion that they were spies for Empire of Japan.

African Americans have long suspected that government operates secretive programs for various purposes of destroying their already disadvantaged communities and members. The long held suspicions by African Americans, often supported by the legal definition of White Privilege, deters cooperation with law enforcement. It is transparency, not secrecy that promotes cooperation.

The City in its Opposition again failed to distinguish protective orders from orders to permanently seal records. In addition to access to class certification records and police reports Proposed Intervenor requests a court ruling on propriety of permanently sealing records from the public. The City may be entitled to sealing some records from some people for some time. It is not entitled to sealing records from all the people for all the time.

In light of the legal theory and history of White Privilege and the federal laws addressing it as such, it is self-evident that equal justice cannot be dispensed

from behind a curtain of secrecy.

## CONCLUSION

For the reasons explained herein, Petitioner respectfully requests that the

Court grant the requested relief set forth above and in Petitioner's concurrently filed

Proposed Order.

Respectfully Submitted,

Weih (Steve) Chang
122 Pumpkin Patch Lane
Hockessin, DE 19707
302-494-9992

DATED: **January 2, 2019**

20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAYVON WRIGHT, ANTOINE MURREY,　\*
KEITH MEDLEY, GREGORY GRIFFIN,　\*
AND RASHAD EL, INDIVIDUALLY,　\*　CASE NO. 13-1966-GAM/SRF
And on behalf of a Class of others similarly　\*
situated,　\*
　\*
　\*
Plaintiffs,　\*
　\*
v.　\*
　\*
City of Wilmington,　\*
　\*
Defendant　\*

## ORDER

Upon Consideration of Proposed Intervenor's Motion to Unseal,

a.　Weih Steve Chang is hereby granted to proceed as Intervenor for the limited purpose of moving to unseal the judicial records of the above-captioned action;

b.　Intervenor's petition to unseal judicial records is hereby granted;

c.　Defendant City of Wilmington/WPD is hereby ordered to file requests for continued sealing within 120 days of the date of this order, in which Defendant shall identify with particularity the information in each docket sheet and document to remain sealed and the compelling interest that justifies the continued sealing of that information.

IT IS SO ORDERED.

JUDGE: _____ .

DATE: _____

CERTIFICATE OF SERVICE

CA NO. 13-1966-GAM/SRF

I hereby certify that on <u>January 2, 2019</u>, I served a copy of the foregoing <u>Reply to Defendant City of Wilmington's Opposition to Unseal Judicial Records</u> document upon the following Parties by <u>email</u>.

Stephen Price Norman
The Norman Law Firm
30838 Vines Creek Road, Suite 3
Dagsboro, DE 19939
snorman@thenormanlawfirm.com

Ryan R. Tack-Hooper
ACLU of Delaware
100 West 10th Street
Wilmington, DE 19801
rtackhooper@aclu-de.org

C. Malcolm Cochran , IV
Richards, Layton & Finger, PA
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cochran@rlf.com

Christine Dealy Haynes
Richards, Layton & Finger, PA
One Rodney Square
920 N. King Street
Wilmington, DE 19801
haynes@rlf.com

Kelly E. Farnan
Richards, Layton & Finger, PA
One Rodney Square
920 N. King Street
Wilmington, DE 19801
farnan@rlf.com

ROSAMARIA TASSONE-DINARDO
800 N. FRENCH STREET
9TH FLOOR
WILMINGTON, DE 19801
RTASSONE@WILMINGTONDE.GOV

Weih (Steve) Chang
122 Pumpkin Patch Lane
Hockessin, DE 19707

DATED: January 2, 2019